2024R00386/HH/NKP

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | : | |
| v. | : | Crim. No. 25-404 |
| | : | |
| ABU MUHAMMAD HAQUE | : | 18 U.S.C. § 371 |
| | : | |

**I N F O R M A T I O N**

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

1.    Unless otherwise indicated, at all times relevant to this Information:

**The Defendant**

a.    Defendant ABU MUHAMMAD HAQUE was a resident of New York and a licensed physician.  Defendant ABU MUHAMMAD HAQUE was an enrolled Medicare provider and submitted claims to Medicare for payment.

b.    Defendant ABU MUHAMMAD HAQUE owned and operated "Newspaper Company 1."

**Relevant Laboratories and Individuals**

c.    "Laboratory Company 1" was a diagnostic laboratory located in New York.  Laboratory Company 1 was an enrolled Medicare provider and submitted claims to Medicare for payment.

d.    "Laboratory Company 2" was a diagnostic laboratory located in New York and Florida.  Laboratory Company 2 was an enrolled Medicare provider and submitted claims to Medicare for payment.

e.     "Laboratory Company 3" was a laboratory located in Secaucus, New Jersey.  Laboratory Company 3 served as a reference laboratory that performed genetic testing on specimens referred by Laboratory Company 1 and Laboratory Company 2.

f.     "Co-Conspirator 1" was a resident of New York and a representative of Laboratory Company 1.

g.     "Co-Conspirator 2" was a resident of New York and owned and managed Laboratory Company 1 and Laboratory Company 2.

**The Medicare Program**

h.     The Medicare Program ("Medicare") was a federally funded health care program that provided free or below-cost benefits to certain individuals, primarily the elderly, blind, or disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS").

i.     Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).  Individuals who received Medicare benefits were referred to as "beneficiaries."

j.     Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B covered medically necessary physician office services and outpatient care, including laboratory tests.

k.    Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided items and services to Medicare beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

l.    When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name; (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

m.    Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered and items provided to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service or item.

n.      To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application for physicians and non-physician practitioners, CMS Form 855I, was required to be signed by the provider. CMS Form 855I contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) . . . ).

o.      In executing CMS Form 855I, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

p.      Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

q.      In certain limited circumstances, Medicare permitted laboratories to establish arrangements with so-called "reference laboratories." Such arrangements existed when a laboratory received a specimen for testing, but instead of testing the specimen in-house, the laboratory acted as a "referring laboratory" by

4

sending the specimen to another laboratory, the "reference laboratory," to complete the testing.

## Genetic Tests

r.    Cancer genetic tests were laboratory tests that used DNA sequencing to detect mutations in genes that could lead to a higher risk of developing cancer or to assist in the treatment of an existing cancer. Cancer genetic tests were not a method of diagnosing, in the first instance, whether an individual had cancer.

s.    In order to have a cancer genetic test performed, an individual typically provided a saliva sample, which contained DNA material ("specimen"). The specimen was then transmitted to a laboratory for testing.

t.    DNA specimens were submitted along with laboratory requisition forms that identified the patient, the patient's insurance, and the specific test to be performed. In order for laboratories to submit claims to Medicare for cancer genetic tests, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test.

u.    Medicare did not cover diagnostic testing, including cancer genetic testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 C.F.R. § 411.15(a)(1).

v.    If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

**The Kickback Conspiracy**

2.      From in or around 2018, and continuing through in or around March 2024, in the District of New Jersey and elsewhere, the defendant,

**ABU MUHAMMAD HAQUE**,

did knowingly and intentionally combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, and others to:

a.      defraud the United States by cheating the United States government and any of its agencies and departments out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare; and

b.      violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and

6

recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## Goal of the Conspiracy

3.      It was the goal of the conspiracy for defendant ABU MUHAMMAD HAQUE, Co-Conspirator 1, Co-Conspirator 2, and others to unlawfully enrich themselves and others by, among other things: (a) soliciting and receiving illegal kickbacks and bribes in exchange for ordering, and arranging for the ordering of, laboratory tests, including cancer genetic tests, for Medicare beneficiaries; (b) submitting and causing the submission of false and fraudulent claims to Medicare for services that were ordered and procured through illegal kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds of the fraud; and (d) diverting proceeds of the fraud for their personal use and benefit, for the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

4.      It was part of the conspiracy that:

a.      Defendant ABU MUHAMMAD HAQUE caused to be submitted a Medicare enrollment application in which he certified that he would abide by all applicable Medicare laws, regulations, and program instructions, and that he would not knowingly present or cause to be presented false or fraudulent claims to Medicare, including claims that were procured through the payment or receipt of kickbacks and

7

bribes.

b.      Defendant ABU MUHAMMAD HAQUE solicited and received illegal kickbacks and bribes from Co-Conspirator 1, Co-Conspirator 2, and others in exchange for ordering, and arranging for the ordering of, laboratory testing, including genetic testing.  The laboratory tests that defendant ABU MUHAMMAD HAQUE ordered and arranged in exchange for the illegal kickbacks and bribes were billed to Medicare by Laboratory Company 1 and Laboratory Company 2.

c.      Defendant ABU MUHAMMAD HAQUE, Co-Conspirator 1, Co-Conspirator 2, and others caused Laboratory Company 1 to submit claims to Medicare for genetic tests that were ordered and arranged through illegal kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented.  These tests were performed by Laboratory Company 3 in New Jersey pursuant to a reference agreement with Laboratory Company 1.

d.      Defendant ABU MUHAMMAD HAQUE, Co-Conspirator 1, Co-Conspirator 2, and others concealed and disguised the scheme by, among other ways: making the illegal kickback payments in cash, paying defendant ABU MUHAMMAD HAQUE by check from Co-Conspirator 1's shell companies; using Newspaper Company 1 to cash and deposit checks from Co-Conspirator 1's shell companies; and falsely indicating in the memo lines of checks that the payments were for services, including, but not limited to, marketing and advertising.

e.      Defendant ABU MUHAMMAD HAQUE, Co-Conspirator 1, Co-Conspirator 2, and others caused Laboratory Company 1 and Laboratory Company 2 to submit in excess of approximately $15.3 million in false and fraudulent claims to

Medicare for laboratory tests, including cancer genetic tests, that were ordered and procured through illegal kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid Laboratory Company 1 and Laboratory Company 2 approximately $839,634 based on these false and fraudulent claims.

## Overt Acts

5.     In furtherance of the conspiracy and to accomplish its goal, at least one of the conspirators committed and caused the commission of one or more of the following acts in the District of New Jersey and elsewhere:

a.     On or about July 31, 2019, defendant ABU MUHAMMAD HAQUE solicited and received an illegal kickback payment from Co-Conspirator 1 by way of a check in the amount of approximately $3,800 in exchange for ordering and arranging for the ordering of laboratory tests, including genetic tests, for Medicare beneficiaries, and sending the laboratory testing orders to Laboratory Company 1 and Laboratory Company 2.

b.     On or about September 12, 2019, defendant ABU MUHAMMAD HAQUE signed a cancer genetic testing laboratory requisition form for Medicare Beneficiary 1.

c.     On or about October 9, 2019, Laboratory Company 3, located in New Jersey, performed a cancer genetic test ordered by defendant ABU MUHAMMAD HAQUE on a specimen collected from Medicare Beneficiary 1, which Laboratory Company 1 billed to Medicare.

d.     On or about November 18, 2019, defendant ABU MUHAMMAD HAQUE signed a cancer genetic testing laboratory requisition form for Medicare Beneficiary 2.

e.     On or about November 30, 2019, Laboratory Company 3, located in New Jersey, performed a cancer genetic test ordered by defendant ABU MUHAMMAD HAQUE on a specimen collected from Medicare Beneficiary 2, which Laboratory Company 1 billed to Medicare.

f.     On or about November 1, 2020, defendant ABU MUHAMMAD HAQUE solicited and received illegal kickbacks from Co-Conspirator 1 by way of a check in the amount of approximately $5,000 in exchange for ordering and arranging for the ordering of laboratory tests for Medicare beneficiaries, and sending the laboratory testing orders to Laboratory Company 1 and Laboratory Company 2.

g.     On or about January 24, 2024, defendant ABU MUHAMMAD HAQUE solicited and received illegal kickbacks from Co-Conspirator 1 in the amount of approximately $3,000 in cash in exchange for ordering and arranging for the ordering of laboratory tests for Medicare beneficiaries and sending the laboratory testing orders to Laboratory Company 1 and Laboratory Company 2.

h.     On or about March 6, 2024, Co-Conspirator 1 and Co-Conspirator 2 offered to pay, and defendant ABU MUHAMMAD HAQUE solicited and agreed to receive, approximately $5,000 in illegal kickbacks per month in exchange for defendant ABU MUHAMMAD HAQUE ordering and arranging for the ordering of laboratory tests and sending the laboratory testing orders to Laboratory Company 1 and Laboratory Company 2.

    i.  On or about March 6, 2024, defendant ABU MUHAMMAD HAQUE received an illegal kickback payment from Co-Conspirator 1 in the amount of approximately $2,000 in cash in exchange for ordering and arranging for the ordering of laboratory tests for Medicare beneficiaries and sending the laboratory testing orders to Laboratory Company 1 and Laboratory Company 2.

  In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

Upon conviction of the Federal health care offense charged in this Information, defendant ABU MUHAMMAD HAQUE shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, the defendant obtained that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense.

## Substitute Assets Provision

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21 United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the up to the value of the forfeitable property described above.

_____
ALINA HABBA
United States Attorney


LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

_____
HYUNGJOO HAN
NICHOLAS K. PEONE
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

CASE NUMBER: **25-** 404

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

### v.

## ABU MUHAMMAD HAQUE

# INFORMATION FOR

**18 U.S.C. § 371**

ALINA HABBA
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

HYUNGJOO HAN
NICHOLAS K. PEONE
TRIAL ATTORNEYS
NEWARK, NEW JERSEY
(202) 754-0901